# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:21-cr-99 (PLF)** |
| v. | : | |
| | : | |
| VAUGHN GORDON, | : | |
| | : | |
| Defendant | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Vaughn Gordon to 30 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

### I.    Introduction

Defendant Vaughn Gordon, 56 years old, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

Defendant Gordon pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case because he: (1) made

---

[1] Although the Statement of Offense in this matter, filed on September 28, 2022, (ECF No. 38 ¶ 6) reflects a sum of more than $2.7 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

statements leading up to January 6 that showed he was aware of—and welcomed—the a possibility of violence; (2) joined a  mob of rioters in the Crypt that pushed its way past a line of police officers; (3) entered the  Rotunda and remained there for about 30 minutes until he and his fellow rioters were forcibly removed by police officers; (4) spent, in total, approximately one complete hour inside the U.S. Capitol building during the riot on January 6; (5) took multiple photos of himself and the mob's activity while inside the Capitol; (6)  readily bragged about his participation in the riot to the public in the following days; and (7) has yet to express any remorse for his participation in the riot.

The Court must also consider that Gordon's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings.  Here, the facts of and circumstances of Gordon's crime support a stricter sentence than mere probation.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF 38 (Statement of Offense), at 1–7.

### Defendant Gordon's Role in the January 6, 2021 Attack on the Capitol

Gordon traveled with a friend from his home in Louisiana to Washington, D.C. to participate in the "Stop the Steal" rally against the results of the 2020 Presidential Election. Following the rally, Gordon approached the U.S. Capitol building from the West front.  Gordon wore goggles, a camouflage cap, and a tan jacket.  Gordon also carried a flag.  At approximately

2:19 p.m., Gordon entered the U.S. Capitol through the Senate Wing Door— just a few minutes after rioters smashed an adjacent and kicked open the door.  *See* Image 1.



Image 1

At approximately 2:20 p.m., Gordon reached the Capitol Crypt, where he joined a larger mob that pushed and eventually broke through a line of police officers.  *See* Image 2 and Image 3.



Image 2



Image 3

Gordon then made his way to the Capitol Rotunda, where he remained for approximately

half-an-hour before the mob was pushed out by officers.  *See* Image 4 and Image 5.



Image 4



Image 5

At approximately 3:19 p.m. Gordon exited the Capitol via the East Rotunda Doors. In total, Gordon spent about one entire hour inside the building.

*Gordon's January 6-Related Statements*

Before January 6, 2021, Gordon made a number of statements on Facebook about his expectations for the event. For example, on December 26, 2020, Gordon commented that "This is the moment which we the people will rise up and take back our nation. In two weeks, mark your calendar, you will see a huge grass roots movement of epic proportions which this country has not seen before since the 18th century and I for one will be in front without fear of death or consequence." On January 3, 2021, Gordon wrote "I am going with more than just numbers. I fully expect this to get ugly[,]" and "Keep your eye on the news[.]"

While inside the Capitol on January 6, Gordon took a number of photos with his phone, some of which he later shared on Facebook. *See, e.g.*, Image 6 (inside the Rotunda) and Image 7 (inside the Crypt). Gordon shared many of these posts repeatedly and confirmed readily to others that "I was there[.]" In one of these posts, Gordon stated that his participation in the riot was "worth the tear gas[.]"




Image 6                                    Image 7

On January 9, 2021, Louisiana-based news organization *The Advocate* published an article entitled "Lafayette man was among those in U.S. Capitol during riot, says he was peaceful amid the 'mayhem.'"[2]  According to the article, on January 9, 2021, Gordon, addressed a crowd in front of the Louisiana State Capitol, stating, "[y]ou're looking at what by mandate is a felon because I entered into the Capitol during the riot," and that he was in the building for nearly *two* hours. Gordon provided some of his photographs from inside the Capitol to *The Advocate*, which were published with the article.  In the article, Gordon also claimed to have been about 20 feet away from a woman shot by Capitol Police and to have needed to shield himself from the batons of Capitol Police.

---

[2] The article is available in its entirety at:
https://www.theadvocate.com/baton_rouge/news/article_bebdcfa8-52c6-11eb-9bf1-63c58373a3e2.html.

*Defendant's Interview*

On January 14, 2021, just before his arrest, FBI agents interviewed Gordon at his residence. Gordon claimed that the Presidential election had been rigged and stated that was why he went to the Capitol. Gordon refused to name the friend with whom he traveled D.C. He further reported that he heard a gunshot while inside the Rotunda. Gordon also showed the FBI various Capitol photos on his cell phone and provided the device's passcode. But he never expressed remorse for his criminal conduct on January 6 during his FBI interview. Likewise, he did not express remorse in his statement to the Probation Officer who drafted the PSR.

*The Charges and Plea Agreement*

On January 14, 2021, the United States charged Gordon by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and 40 U.S.C. § 5104(e)(2)(G). Law enforcement officers arrested him on that day. On February 9, 2021, the United States charged Gordon by a four-count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). On September 28, 2022, pursuant to a plea agreement, Gordon pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). In that plea agreement, Gordon agreed to pay $500 in restitution to the Department of the Treasury.

**III.    Statutory Penalties**

Gordon now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Gordon faces up to six months of imprisonment and a fine of up to $5,000. Gordon must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79

(D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Gordon's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Gordon, the absence of violent or destructive acts is not a mitigating factor. Had Gordon engaged in such conduct, he or she would have faced additional criminal charges.

Gordon's incendiary public rhetoric leading up to January 6 was a particularly aggravating feature of his conduct. He encouraged his Facebook followers to "rise up and take back our nation." This was not a mere exhortation for peaceful protest. Gordon acknowledged the possibility of violence ("I for one will be in front without fear of death or consequence."). He punctuated the point with a cryptic remark that he would not be going to Washington, D.C. empty handed ("I am going with more than just numbers. I fully expect this to get ugly").

Those statements show that Gordon was well aware of the potential for violence on January 6. Afterwards, he took pride in his participation in the violent mob. Moreover, his breach into the building just minutes after the first wave of rioters violently broke through the Senate Wing Door, as well as his membership in the mob that subsequently accumulated in the Crypt, necessarily placed him in or near situations where the dangers of the day were immediately apparent.

Gordon's later assumption that he would be labeled a "felon" for his activity also shows that he was well aware of the weight his participation added to the riot as a whole. His interview with *The Advocate* and readiness to show off the photographic trophies to the media also demonstrate, at a minimum, that he certainly did not feel remorse for his conduct for the week following the riot. And, beyond his decision to plead guilty, there have been no indications that Gordon has felt any subsequent remorse for his conduct.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Gordon

As set forth in the PSR, Gordon does not have a criminal history. He has maintained employment since October 2020 doing car restorations.

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

**D. The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message

did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Gordon's inclination to immediately being sharing his role in the Capitol Riot—through social media and traditional media—demonstrates a need for specific deterrence. Gordon arrived in D.C. ready for a riot, participated in a riot, and made sure the world knew he joined a riot as soon as he could. The Court should fashion a sentence that impresses upon Gordon the seriousness of these acts.

**E.  The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress. [3] This

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Court must sentence Gordon based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Gordon has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however. Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing

uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by

sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Sarko*, 21-cr-591 (CKK), the defendant observed rioters making violent entry into the U.S. Capitol, including by breaking a window during the initial breach of the Senate Wing Door.  Without authorization, Sarko entered the office of United States Senator Jeff Merkley and a room used by visiting spouses of U.S. Senators and members of the House of Representatives without authorization.   Sarko also proudly recorded  himself outside of the U.S. Capitol, exclaiming "We  are storming the Capitol out here"; "Where are the traitors"; "Bring out Pelosi!"; "We won't let you steal this country"; "We're actually breaking in right now"; and "Fight for Trump!" and chanted and cheered while approaching the U.S. Capitol.  He also posted video to Snapchat of his conduct inside and outside of the U.S. Capitol.  Sarko pled guilty to 40 U.S.C. § 5104(e)(2)G) and was sentenced to 30 days of incarceration and a 36-month term of probation.[4]

---

[4] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence"—a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case); see generally Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(1), which authorize limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2

In *United States v. Meteer*, 21-cr-630 (CJN), the defendant breached the Capitol after he followed a mob of rioters that overran the police at the Upper West Terrace Staircase and remained in the Capitol for over half-an-hour.  He celebrated this action and, following January 6, repeatedly downplaying the violence that occurred.  He also had a criminal history and possessed firearms in his home, despite being prohibited from doing so due to a prior felony conviction.  The defendant pled guilty, and the Court sentenced him to 60 days of incarceration and a 36-month term of probation.  While Gordon, unlike Meteer, does not have a criminal history, Gordon nevertheless stayed in the Capitol for almost twice as much time and joined at least one mob that broke through a police line.

In *United States v. Valadez*, 21-cr-695 (JEB), the defendant knees took video of the throngs of persons who had unlawfully entered the Capitol grounds and expressed his approval of their conduct on the video, then posted that video on Facebook.  He entered the Capitol through the Senate Wing Door ten minutes after it was initially breached, was part of the mob that pushed past

---

(D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at \*9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

officers in the Crypt, and did not express remorse for his actions.  Moreover, he doubled down, a month after the riot, on his claims that the riot was justified.  Valadez pled guilty to 40 U.S.C. § 5104(e)(2)(G) and the Court sentenced him to 30 days of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Gordon to 30 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/ *Nathaniel K. Whitesel*
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7759